IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **REALTIME DATA, LLC,** | § § § | |
| *Plaintiff,* | § § § | **CIVIL ACTION NO. 6:16-CV-00086 RWS-JDL** |
| v. | § § § | **JURY TRIAL DEMANDED** |
| **HEWLETT PACKARD ENTERPRISE CO., ET AL.,** | § § § § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant Silver Peak Systems, Inc.'s ("Silver Peak") Motion to Sever and Transfer Venue Pursuant to 28 U.S.C. § 1404. (Doc. No. 55.) Plaintiff Realtime Data LLC ("Realtime") has filed an Opposition (Doc. No. 61), Silver Peak has filed a Reply (Doc. No. 70), and Realtime has filed a Sur-Reply (Doc. No. 73).

After consideration of the parties' arguments and for the reasons stated herein, the Court **GRANTS** Silver Peak's Motion to Sever and Transfer Venue. (Doc. No. 55.)

**I.   BACKGROUND**

Realtime is a New York limited liability company with its principal place of business located at 116 Croton Lake Road, Katonah, New York 10536. (Doc. No. 1, ¶ 1.) Realtime also maintains offices in Tyler, Texas and Plano, Texas, where Realtime purports to keep substantially all of its documents relevant to this case. (*Id.*; Doc. No. 61-2 ("Tashjian Decl."), ¶ 5.)

On February 26, 2016, Realtime sued Silver Peak, Hewlett Packard Enterprise Co. ("HPE"), and Hewlett Packard Enterprise Services, LLC ("HPES") for patent infringement. (Doc. No. 1.) On the same day, Realtime filed two additional actions alleging infringement of the same patents, both of which were also assigned to Judge Schroeder and referred to the undersigned. *See Realtime Data LLC v. Savvis Comm'ns Corp.*, No. 6:16-cv-87 (E.D. Tex. Feb. 26, 2016); *Realtime Data LLC v. Dell, Inc.*, No. 6:16-cv-00089 (E.D. Tex. Feb. 26, 2016).

In its Original Complaint, Realtime alleged that Silver Peak and HPE/HPES have a "business alliance" where Silver Peak is an "HP Networking Alliance Partner" of HPE/HPES. (*Id.* at ¶ 5.) Realtime also alleged that "pursuant to ongoing contractual arrangements between HPE/HPES and Silver Peak . . . SilverPeak promotes the use of HPE/HPES products with SilverPeak's own products." (*Id.*) Realtime concluded by stating "[a]s further explained below, products such as Silver Peak's virtual WAN appliances infringe the asserted patents. Accordingly, HPE/HPES are properly joined in this action pursuant to 35 U.S.C. § 299." (*Id.*)

In their answers to the Complaint, HPE/HPES and Silver Peak admitted that Silver Peak was listed as a participant in the HP AllianceONE Program. (Doc. No. 15, ¶5; Doc. No. 20, ¶5.) Silver Peak also admitted that "Silver Peak's products may be used in conjunction with certain HP products." (Doc. No. 20, ¶5.)

Realtime later filed a First Amended Complaint, which contains the same allegations regarding the relationship between HPE/HPES and Silver Peak as the Original Complaint. (*See* Doc. No. 36, ¶5.) Defendants have likewise filed similar answers to these allegations. (Doc. No. 52, ¶5; Doc. No. 53, ¶5.) In its Amended Answer, Silver Peak also denies that it is properly joined with HPE/HPES. (Doc. No. 53, ¶5.) On August 25, 2016, Realtime served separate infringement contentions against each Defendant. (*See* Doc. No. 55, Exs. A, N.) The

infringement contentions Realtime served on Silver Peak do not mention any HPE or HPES products, and vice versa.  (*See generally*, *id.*)  Silver Peak filed the instant motion on September 9, 2016.  (Doc. No. 55.)

Silver Peak is a Delaware Corporation with its principal place of business located in Santa Clara, California.  (Doc. No. 53, ¶4.)  Silver Peak asserts that all of its products were conceived, developed, and designed at its Santa Clara headquarters.  (Doc. No. 55-1 ("Hughes Decl."), ¶3.)  Silver Peak further asserts that its software operates on virtually any kind of server and was not developed or made specifically for any HPE/HPES hardware.  (*Id.* at ¶5.)  Silver Peak asserts that all of its "technical documents and highly confidential source code, as well as its sales, marketing, and financial information" relating to its products are located and maintained in the San Francisco Bay Area.  (Doc. No. 55-2 ("Yeaman Decl."), ¶5.)

## II.   APPLICABLE LAW

### A.   Joinder Requirements Under 35 U.S.C. § 299(a)

Defendants may be joined in an action if: "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  FED.R.CIV.P. 20(a)(2).  In the patent infringement context, accused infringers may only be joined if the right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences relates "to the making, using, importing into the United States, offering for sale, or selling of the same accused product or process," and "questions of fact common to all defendants or counterclaim defendants will arise in the action." 35 U.S.C. § 299(a).  Accused infringers may not be joined on the sole basis that they have each infringed the patents-in-suit.  § 299(b).  Moreover, claims against independent

defendants may not be joined under Rule 20 "unless the facts underlying the claim of infringement asserted against each defendant share an aggregate of operative facts." *In re EMC Corporation*, 677 F.3d 1351, 1359 (Fed. Cir. 2012).[1]

### B. Transfer Under 28 U.S.C. § 1404(a)

Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The goals of § 1404(a) are to prevent waste of time, energy, and money, and also to protect litigants, witnesses, and the public against unnecessary inconvenience and expense. *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). Ultimately it is within a district court's sound discretion to transfer venue pursuant to 28 U.S.C. § 1404(a), but the court must exercise its discretion in light of the particular circumstances of the case. *Hanby v. Shell Oil Co.*, 144 F. Supp. 2d 673, 676 (E.D. Tex. 2001); *Mohamed v. Mazda Corp.*, 90 F. Supp. 2d 757, 768 (E.D. Tex. 2000). The party seeking transfer must show good cause for the transfer. *In re Volkswagen of America, Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) ("*Volkswagen II*"). To show good cause, the moving party must demonstrate the transferee venue is clearly more convenient. *Id.*

When deciding whether to transfer venue, a district court balances the private interests of the parties and the public interests in the fair and efficient administration of justice. The private interest factors the court considers are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case

---

[1] The *In re EMC* court made clear that it was addressing the joinder requirements under Rule 20, not those codified by the AIA. *See In re EMC*, 677 F.3d at 1360 n.4. However, this Court finds that the *In re EMC* analysis of what constitutes a common transaction or occurrence for the purpose of Rule 20 is persuasive regarding interpretation of common transactions or occurrences under AIA as well.

easy, expeditious, and inexpensive. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). The public interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict laws or in the application of foreign law. *Id.*

## III. DISCUSSION

### A. Joinder Under 35 U.S.C. § 299

Silver Peak argues that it is improperly joined with HPE/HPES in this action because Realtime's claims against Silver Peak are immaterial to Realtime's claims against HPE/HPES. (Doc. No. 55, at 6.) Silver Peak argues that its software is designed to run on any hardware—not just HPE/HPES servers. (*Id.*; *see also* Hughes Decl., ¶5 ("Silver Peak's software operates on virtually any kind of server, as well as other forms of third-party hardware.").) Silver Peak also emphasizes that Realtime's infringement contentions against Silver Peak identify only Silver Peak products and lack any mention of HPE/HPES. (*Id.*; *see also* Doc. No. 55, Exs. A, N.) Silver Peak alternatively argues that the Court should exercise its discretion to sever the claims against Silver Peak pursuant to Rule 21. (Doc. No. 55, at 8.) In opposition, Realtime argues that Silver Peak and HPE/HPES have admitted they are in an "alliance" that relates to the accused products in the case. (Doc. No. 61, at 4.) Realtime relies on a "Solution Brief" published by HP Networking and Silver Peak that emphasizes that the companies have "work[ed] together as a collaborative team. . . [to] deliver easily deployed WAN optimization solutions for a range of enterprises." (Doc. No. 61, Ex. 1, at 3.) Realtime argues that according to the Solution Brief, Silver Peak and HPE/HPES jointly "validated" and "tested" Silver Peak's VX Virtual Appliances product. (Doc. No. 61, at 6.) Realtime's opposition does not address the fact that its

5

infringement contentions for Silver Peak do not include mention of HPE/HPES. In reply, Silver Peak submits a supplemental declaration of founder and CEO David Hughes, stating that "[n]either Hewlett Packard nor HPE were ever involved in the design, development, production, manufacturing, or testing of any Silver Peak products." (Doc. No. 70-1 ("Hughes Supp. Decl."), ¶3.) In sur-reply, Realtime emphasizes that Silver Peak and HPE/HPES at least jointly market and sell the accused products such that joinder is appropriate. (Doc. No. 73, at 1-2.)

As stated above, accused patent infringers may only be joined if the right to relief relates "to the making, using, importing into the United States, offering for sale, or selling *of the same accused product or process*." 35 U.S.C. § 299(a) (emphasis added). The fact that Realtime's infringement contentions against Silver Peak do not mention any HPE or HPES products and vice versa is persuasive. (Doc. No. 55, Exs. A, N.) Realtime's argument—first presented in its Opposition to Silver Peak's Motion—that Silver Peak and HPE/HPES have a "joint HP/Silver Peak solution" *product* is not supported by a fair reading the Silver Peak and HPE/HPES's "Solution Brief" and is also undermined by Realtime's infringement contentions. Given the circumstances here, joint product marketing is insufficient to meet the joinder requirements under § 299. This is particularly true given that Silver Peak and HPE/HPES's so-called "alliance" does not appear to be the type of extensive partnership that Realtime insinuates. Indeed, the HPE/HPES and Silver Peak "Solution Brief" includes the following explanation of HP AllianceONE: "Comprised of *thousands* of Independent Software Vendors (ISVs), Independent Hardware Vendors (IHVs), Original Equipment Vendors (OEM), System Integrators (SIs), and Service Providers (SPs)—HP AllianceONE offers an *extensive selection of market-leading, standards-based applications* that integrate cleanly with your existing network." (Doc. No. 61, Ex. 1, at 3 (emphasis added).) Joining HPE/HPES and Silver Peak on

these facts would open the door to allow Plaintiffs to assert joinder of HPE/HPES in combination with literally *thousands* of other independent companies on the sole basis that they have a "marketing alliance." Given the nature of this industry, particularly the fact that individual products or processes must be able to integrate into a larger system (for instance, software must be tested to ensure it is combinable with hardware), there must be some further evidence of a relationship between the parties with respect to a certain product or process in order to support joinder under § 299. Accordingly, the Court finds that the claims against Silver Peak should be **SEVERED** from the claims against HPE/HPES.

Because the Court finds that HPE/HPES and Silver Peak are improperly joined under 35 U.S.C. § 299, it does not reach the issue of permissive severance under Rule 21.

### B. Transfer Under 28 U.S.C. § 1404(a)

Realtime does not dispute that venue would be proper in the Northern District of California. The Court thus proceeds to analyze the private and public interest factors under §1404(a).

#### 1. Private Interest Factors

##### a) The relative ease of access to sources of proof

As Silver Peak notes, this factor remains a part of the transfer analysis despite technological advances that have lightened the inconvenience of transporting large amounts of documents. *Volkswagen II*, 545 F.3d at 316. Courts analyze this factor in light of the distance evidence must be transported from its existing location to the trial venue. *See id.* The accused patent infringer is presumed to have the greater volume of documents relevant to the litigation such that more weight is placed on the location of the accused infringer's documents. *See, e.g., in re Nintendo Co., Ltd.*, 589 F.3d 1194, 1199 (Fed. Cir. 2009); *In re Genentech, Inc.*, 566 F.3d

7

1338, 1345 (Fed. Cir. 2009); *Volkswagen II*, 545 F.3d at 314-15. Documents that have been moved to a particular venue in anticipation of litigation are not considered in this analysis. *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1336-37 (Fed. Cir. 2009).

To meet its burden under this factor, Silver Peak must identify its sources of proof with some specificity such that the Court may determine whether transfer to a particular district will increase the convenience of the parties. *J2 Global Comm'ns, Inc. v. Proctus IP Solutions, Inc.*, No. 6:08-cv-211, 2009 WL 440525, at *2 (E.D. Tex. Feb. 20, 2009); *see also Invitrogen v. Gen. Elec. Co.*, No. 6:08-cv-113, 2009 WL 331889, at *3 (E.D. Tex. Feb. 9, 2009) (finding that general statements that relevant documents were located in either England or New Jersey "fail to show that transfer would make access to sources of proof either more or less convenient for the parties.") In its declaration, Silver Peak states "*[a]ll* of Silver Peak's technical documents and highly confidential source code, as well as its sales, marketing, and financial information relating to Silver Peak's products are located and maintained in the San Francisco Bay Area." (Yeaman Decl., ¶5 (emphasis added).) Realtime's declaration states that "[s]ince 2009, substantially all of Realtime's documents relating to its intellectual property development and licensing were either physically located at Realtime's Tyler office or exist electronically and will be collected from Realtime's Tyler office." (Tashjian Decl., ¶5.)

Although Realtime's relevant documents and evidence are housed in this district, the location of Realtime's documents and witnesses is afforded less weight than the location of Silver Peak's documents and witnesses. *See Genentech*, 566 F.3d at 1345 ("[T]he bulk of the relevant evidence usually comes from the accused infringer.") Given that *all* of Silver Peak's relevant documents are located in the Northern District of California (Yeaman Decl., ¶5), this factor weighs in favor of transfer.

### b) The availability of compulsory process

This factor will weigh more heavily in favor of transfer when more third-party witnesses reside within the transferee venue. *See Volkswagen II*, 545 F.3d at 316. The Court gives more weight to specifically-identified witnesses and affords less weight to vague assertions that witnesses are likely located in a particular forum. *See Novelpoint Learning v. Leapfrog Enter.*, No. 6:10-cv-229, 2010 WL 5068146, at *6 (E.D. Tex. Dec. 6, 2010); *West Coast Trends, Inc. v. Ogio Int'l, Inc.*, No. 6:10-cv-688, 2011 WL 5117850, at *3 (E.D. Tex. Oct. 27, 2011).

Silver Peak identifies two non-employee witnesses it believes reside in the "San Francisco Bay Area": John Burns, a former Silver Peak Software Architect engineer, and Marc Trimuschat, a former Silver Peak Vice President of Business Development and Global Alliances. (Yeaman Decl., ¶10.) Silver Peak also identifies several authors of prior art patents and publications who reside in the San Francisco Bay Area. (Doc. No. 55, Exs. E-L.) Silver Peak states that it "is likely to rely on the above prior art and associated documentation regarding the prior art systems and witnesses to support its invalidity defenses." (Doc. No. 55, Exs. E-M.) Realtime argues that "Silver Peak fails to show that any of these alleged third-party witnesses have any unique knowledge of relevant facts not already held by party-controlled witnesses." (Doc. No. 61, at 11.) Realtime also emphasizes that witnesses can easily appear at trial via videotaped deposition. (*Id.*) Realtime argues that Silver Peak's alleged prior art witnesses should not be considered in the analysis. (*Id.*) Realtime identifies the LinkedIn pages of two former Silver Peak employees who live in Texas and asserts that they "are knowledgeable about the accused products." (*Id.* at 12 (citing Doc. No. 61, Exs. 7-8).) Realtime also argues that some of Silver Peak's biggest customers are based in Texas and will have relevant knowledge relating to indirect infringement of the accused products. (*Id.*) In reply, Silver Peak argues that Realtime

"cannot counter Silver Peak's identification of relevant, necessary non-party witnesses by pointing to former Silver Peak employees (presumably) in this District." (Doc. No. 70, at 4.) In sur-reply, Realtime emphasizes that Silver Peak has still failed to show that its identified third party witnesses have unique knowledge. (Doc. No. 73, at 4.) Realtime states "Silver Peak cannot rely on cherry-picked former employees who happen to still reside in N.D. Cal. Without making any showing as to why they are necessary for trial, because Realtime can just as easily do the same." (*Id.*)

As an initial matter, when parties simply name third-party witnesses without identifying the nature of the testimony or asserting, on a good faith basis, whether a party intends to depose or call a witness to trial, analysis of this factor is a futile and pointless exercise. At a minimum, in order to allow the Court to properly weigh this factor, litigants should identify the relevancy and materiality of the information such witnesses would provide and therefore the foreseeability that a particular witness would be deposed, called to trial, or both. This identification enables the Court to give proper weight to each witness and analyze whether a particular witness is actually subject to a particular court's subpoena power.

In its Motion and supporting affidavits, Silver Peak includes the job titles for its proposed current and former employee witnesses. (*See, e.g.*, Yeaman Decl., ¶10.) With respect to its former employees, it also asserts in its Motion that they "would likely testify at trial if possible." (Doc. No. 55, at 4.) Beyond that, Silver Peak provides scant information about the relevant material those witnesses would testify about in this matter. However, in reply Silver Peak submits both a supplemental declaration and the Initial Disclosures served by Silver Peak and Realtime in this action. (*See* Doc. No. 70, Exs. W-X; Hughes Supp. Decl.) Silver Peak's Initial Disclosures were served three weeks before Silver Peak filed its Motion to Transfer. (*See* Doc.

No. 70, Ex. W.) Each of the witnesses that Silver Peak references in its Motion are listed in its Initial Disclosures. (*See id.*) The Initial Disclosures also further include a short description of the "Subject Matter" each individual is knowledgeable about with respect to this matter. (*See id.*) Mr. Hughes' supplemental declaration includes statements specifically with respect to Silver Peak's two former employees consistent with the descriptions in the Initial Disclosures. (*See* Hughes Supp. Decl., ¶4.) Mr. Hughes states that John Burns "authored substantial parts of Silver Peak's network memory source code and has unique relevant knowledge regarding its design and development." (*Id.*) Based on this description, the Court is persuaded that Mr. Burns is likely to have knowledge relevant to this case. With respect to Marc Trimuschat, Mr. Hughes states that he "has unique and relevant knowledge on Silver Peak's marketing relationship with HPE." (*Id.*) Given the Court's finding that Silver Peak and HPE/HPES are improperly joined and that Silver Peak should be severed from this matter, Mr. Trimuschat's knowledge is not as likely to be relevant to Realtime's patent infringement allegations against Silver Peak.

Although the three prior art witnesses identified by Silver Peak in its Motion are also included in its Initial Disclosures, as this court has previously noted, "inventors of prior art rarely, if ever, actually testify at trial." *PersonalWeb Techs. LLC v. NEC Corp. of Am., Inc.*, No. 6:11-cv-655, 2013 WL 9600333, at *8 n. 13 (E.D. Tex. Mar. 21, 2013). Because Silver Peak has not specifically stated whether it intends to depose some or all of these witnesses, let alone whether they are expected to be called at trial, the Court does not weigh them in the convenience analysis.

On the other side of the scale, the only potential third party witnesses Realtime identifies are two former Silver Peak employees who now reside in Texas. (Doc. No. 61, at 12 (citing Doc. No. 61, Exs. 7-8).) These witnesses do not appear on either party's Initial Disclosures.

(*See* Doc. No. 70, Exs. W-X.) Nor has Realtime described how they have relevant knowledge to this matter, or whether Realtime intends to call them to testify at trial. The Court does not afford them any weight.

While the Court recognizes Realtime's suggestion of playing videotaped depositions at trial may be a viable option under Rule 45, such a suggestion does not address the potential value to be added by having a witness testify in person at trial. The Court will not speculate as to whether the videotaped testimony of any of Silver Peak's proposed witnesses would be sufficient if played at trial in comparison to live testimony. The Court also affords no weight to Realtime's arguments that prominent Silver Peak customers are based in Texas and may have relevant knowledge. (Doc. No. 61, at 12.) The Court cannot base its conclusion on unidentified witnesses and vague assertions. *Novelpoint Learning*, 2010 WL 5068146, at *6.

On balance, Realtime has not identified any relevant third-party witnesses within this Court's subpoena power, whereas Silver Peak has identified at least one former Silver Peak employees in the Northern District of California who has knowledge likely relevant to this above-captioned matter. This factor weighs in favor of transfer.

c) **The cost of attendance for willing witnesses**

This factor gives broad "consideration [to] the parties and witnesses in all claims and controversies properly joined in a proceeding." *Volkswagen I*, 371 F.3d at 204. All potential material and relevant witnesses must be taken into account. *See id*.

Sliver Peak cites to the declaration of Mr. Eric Yeaman, Chief Financial Officer of Silver Peak, to support its identification of willing witnesses. (Doc. No. 55, at 10.) Mr. Yeaman identifies himself, Silver Peak's CEO David Hughes, and Senior VP of Products Damon Ennis as willing witnesses who could testify in this matter and work and live in Northern California.

12

(Yeaman Decl., ¶8.) Silver Peak acknowledges that it has two employees who live in the Eastern District of Texas, but states that these employees are involved in sales and do not have relevant knowledge with respect to this matter. (*Id.* at ¶6, 8.) Silver Peak notes that it employs approximately 212 people and the "vast majority" of its employees involved in the development of Silver Peak products work at Silver Peak's Santa Clara headquarters. (*Id.* at ¶3.) Mr. Yeaman also notes that "[d]ue to the small size of Silver Peak's workforce, it would be costly for Silver Peak to have executives and employees travel to the Eastern District of [Texas], as it would require airfare, lodging, and lost productivity. (*Id.* at ¶9.) Realtime argues that Silver Peak has "numerous other" Texas employees with relevant information regarding the accused products and cites to two LinkedIn profiles for Silver Peak employees located in Austin, Texas. (Doc. No. 61, at 8; *see also* Doc. No. 61, Exs. 3, 6.) Realtime also argues that Silver Peak's "vague, generalized statements" that its witnesses have "relevant knowledge" are insufficient for Silver Peak to carry its burden on the transfer motion. (Doc. No. 61, at 9.) As to its own willing witnesses, Realtime identifies Deepika Pagala, an electrical engineer employee located in Plano, Texas (Tashjian Decl., ¶7) and four potential party witnesses in New York. (*Id.* at ¶¶2, 9.) Realtime argues that if this case is transferred to the Northern District of California, its New York witnesses will be required to travel twice as far as they would if trial is held in this District. (Doc. No. 61, at 9.)

In reply, Silver Peak notes that Realtime does not explain why the Silver Peak employees in Texas "are relevant or how they have unique information." (Doc. No. 70, at 2.) Silver Peak argues that the employees do not possess relevant information, "hence neither party identified them in their respective initial disclosures." (*Id.* at 2 n.1; *see also* Doc. No. 70, Exs. W-X.)

Silver Peak also argues that Realtime does not explain how its employee, Ms. Pagala, has knowledge necessary to this case. (Doc. No. 70, at 3.)

The fact that Realtime's New York witnesses have indicated that proceeding in this District will be more convenient for them is entitled to little weight. Because Realtime's named witnesses reside in New York, they "will be required to travel a significant distance no matter where they testify." *Genentech*, 566 F.3d at 1345. Accordingly, any added inconvenience to Realtime's witnesses of traveling to California, rather than to Texas, should not be overemphasized. However, the Court does consider Realtime's electrical engineer employee, Ms. Pagala, who resides in this District. (*See* Tashjian Decl., ¶7.) Realtime has not responded to Silver Peak's challenges regarding whether Ms. Pagala has relevant testimony. (*See* Doc. No. Indeed, beyond stating that Ms. Pagala "assists in the development and licensing of Realtime's intellectual property portfolio," Realtime has not indicated whether Ms. Pagala is expected to offer any relevant testimony in this case. (Tashjian Decl., ¶7.) The Court does not afford great weight to this potential Realtime witness, either.

The Court again declines to consider the two Silver Peak employees in Texas that Realtime has identified. These individuals are not on either parties' initial disclosures and there is simply no indication that they are relevant to Silver Peak's claims or defenses.

Realtime has one employee who resides in this District, but it is unclear whether she has any relevant knowledge related to this litigation. (*See* Tashjian Decl., ¶7.) Meanwhile, Silver Peak has submitted at least three willing witnesses who work in Santa Clara, California (Yeaman Decl., ¶8) and would be "unnecessarily inconvenienced by having to travel away from home to testify" in this district. *PersonalWeb Technolgies, LLC v. NEC Corp. of Am., Inc.*, No. 6:11-CV-655, 2013 WL 9600333, at *4 (E.D. Tex. Mar. 21, 2013). Silver Peak's Initial Disclosures

14

demonstrate that its three witnesses have knowledge relevant to this matter. (Doc. No. 70, Ex. W.) This factor weighs in favor of transfer.

### d) Other practical problems

Practical problems include those that are rationally based on judicial economy. The existence of duplicative suits involving the same or similar issues may create practical difficulties that will effect transfer. *In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009) (*"Volkswagen III"*). Further, "the existence of multiple lawsuits involving the same issues 'is a paramount consideration when determining whether a transfer is in the interest of justice.'" *In re Vicor Corp.*, 493 F. App'x 59, 61 (Fed. Cir. 2012) (quoting *Volkswagen III*, 566 F.3d at 1351). The Court weighs this factor according to the situation that existed at the time the action was initiated. *See Hoffman v. Blaski*, 363 U.S. 335, 343 (1960) (indicating motions to transfer venue are to be decided based on "the situation which existed when the suit was instituted."); *In re EMC Corp.*, 501 F. App'x 973, 975-76 (Fed. Cir. Jan. 29, 2013).

Rather than affirmatively arguing that this factor favors transfer, Silver Peak's opening brief focuses on anticipating Realtime's arguments. Silver Peak argues that Realtime's choice of forum is not conclusive or determinative and should be entitled to less deference when the other operative facts weigh against transfer. (Doc. No. 55, at 13.) Silver Peak also argues "[t]his case remains in its earliest stages and this Court's prior experience with the patents-in-suit does not support denying transfer." (*Id.*) Realtime argues that transferring Silver Peak creates many practical problems by creating multiple lawsuits on same or similar issues. (Doc. No. 61, at 12-14.) Realtime emphasizes the district court's experience with the patents-in-suit from prior and pending litigation. (*Id.* at 13.)

At the time the Complaint was filed, the Northern District of California had no experience with any of the patents-in-suit.[2]

On the other hand, at the time of the filing of this suit, there was also at least some benefit to having the same judge handle related pretrial issues, including pretrial issues related to two other Realtime cases filed in this District the same day. *In re EMC Corp.*, 501 F. App'x at 975-76; *see Realtime Data LLC v. Savvis Comm'ns Corp.*, No. 6:16-cv-87 (E.D. Tex. Feb. 26, 2016); *Realtime Data LLC v. Dell, Inc.*, No. 6:16-cv-00089 (E.D. Tex. Feb. 26, 2016). The Court concludes that this factor weighs slightly against transfer.

### 2. Public Interest Factors

#### a) Administrative difficulties flowing from court congestion

Silver Peak argues that because the Eastern District of Texas has "an incredibly active docket," with "25% more cases filed per judge than the Northern District of California," this factor favors transfer. (Doc. No. 55, at 14 (citing Doc. No. 55, Ex. V).) Realtime argues that because median time from filing to trial is faster in the Eastern District of Texas, this factor weighs against transfer. (Doc. No. 61, at 14 (citing Doc. No. 55, Ex. V).) As the Court has repeatedly found in the past, the parties' reliance on general civil statistics provides the Court with little guidance as to the speed with which patent cases reach trial. *See West Coast Trends, Inc.*, No. 6:10-cv-688, 2011 WL 5117850, at *4 (E.D. Tex., Oct. 27, 2011) ("[a]s is common with this factor, the parties cite to incongruous statistics which prevents the Court from drawing

---

[2] This Court has granted transfers to the Northern District of California with respect to three Realtime defendants. However, only two of those defendants were actually transferred to the Northern District of California; the third was voluntarily dismissed from the action prior to transfer. *See Realtime Data, LLC v. Actian Corp.*, No. 6:15-cv-463, Doc. No. 243 (E.D. Tex. Feb. 22, 2016) (dismissing Dropbox prior to transfer). More importantly, the two transfers did not occur until after the above-captioned matter was filed. *Realtime Data LLC d/b/a IXO v. Teradata Operations Inc.*, No. 3:16-cv-01836 (N.D. Cal. Apr. 8, 2016); *See Realtime Data, LLC d/b/a IXO v. Apple, Inc.*, No. 3:16-cv-02595 (N.D. Cal. May 13, 2016). In keeping with the understanding that "[m]otions to transfer venue are to be decided based on 'the situation which existed when suit was instituted,'" the Court declines to consider any familiarity the Northern District of California may have later developed with respect to the patents-in-suit. *See in re EMC Corp.*, 501 F. App'x 973, 976 (Fed. Cir. 2013).

a meaningful conclusion as to court congestion."). Indeed, even the two statistics the parties cite—number of cases filed and median time from filing to trial—weigh in favor of opposite conclusions. Due to its speculative nature, the Court finds this factor neutral.

### b) Local interest in having localized interests decided at home

"Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Volkswagen I*, 371 F.3d at 206. Generally, however, local interests that "could apply virtually to any judicial district or division in the United States" are disregarded in favor of particularized local interests. *In re TS Tech*, 551 F.3d at 1321; *Volkswagen II*, 545 F.3d at 318 (disregarding local interest of citizens who used the widely sold product within the transferor venue in a products liability suit). Thus, when products are sold throughout the United States, citizens of a venue do not have a particularized interest in deciding the dispute simply based on product sales within the venue. *Nintendo*, 589 F.3d at 1198.

Silver Peak argues that the Northern District of California has a strong local interest in the resolution of this litigation because all of Silver Peak's products were developed in that district and the "only relevant connection with this district arises from the nationwide sale of its products." (Doc. No. 55, at 14.) Silver Peak emphasizes that it is headquartered in the Northern District of California and that its key employees and third party witnesses reside there. (*Id.*) Realtime responds that Silver Peak's argument should be rejected because California jurors would be biased towards Silver Peak. (Doc. No. 61, at 15.) Realtime notes that "Texas has just as much interest in this case as California, if not more." (*Id.*) Realtime argues that Silver Peak has ties to this district because Texas is home to Silver Peak customers and "strategic partners." (*Id.*) Realtime further argues that it has "deep ties" to the district, emphasizing its two offices and its employee in Plano, Texas. (*Id.*)

Ultimately, because Silver Peak has identified several individuals whose work relates to the accused technology and who are located in the Northern District of California, the Court finds that the Northern District of California has a greater local interest in the outcome of the litigation. *See In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1336 (Fed. Cir. 2009) ("[L]ocal interest in this case remains strong because the cause of action calls into question the work and reputation of several individuals residing in or near that district and who presumably conduct business in that community."); *Eon Corp. IP Holdings, LLC v. Sensus, USA Inc.*, No. 2:10-cv-448, 2012 WL 122562 (E.D. Tex. Jan. 9, 2012). This District also has at least some local interest given that Realtime has two offices and one employee here, but on balance, this factor weighs slightly in favor of transfer.

### c) The Remaining Public Interest Factors

Both parties assert that the remaining two public interest factors are neutral. (Doc. No. 55, at 15; Doc. No. 61, at 15.) The Court agrees. With respect to the third and fourth factors, both courts are familiar with federal patent law and there are no conflicts of laws questions to avoid.

### 3. Weighing the Transfer Factors

For the reasons explained above, relative ease of access to sources of proof weighs in favor of transfer; availability of compulsory process weighs in favor of transfer; cost of attendance for willing witnesses weighs in favor of transfer; practical problems, including judicial economy, weighs slightly against transfer; local interest in having localized interests decided at home weighs slightly in favor of transfer; and the remaining public interest factors a neutral. Silver Peak has met its burden of showing that the Northern District of California is "clearly more convenient" under the transfer factors.

## IV. CONCLUSION

Accordingly, Silver Peak's Motion to Sever and Transfer Venue Pursuant to 28 U.S.C. § 1404 (Doc. No. 55) is **GRANTED**.

**So ORDERED and SIGNED this 3rd day of February, 2017.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE